Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/27/2025 09:09 AM CDT

WILLIAM C. DUGAN, APPELLEE, V.
STEVE SORENSEN, APPELLANT.

___ N.W.3d ___

Filed June 27, 2025.    No. S-24-716.

1. **Protection Orders: Appeal and Error.** The grant or denial of a protection order is reviewed de novo on the record. In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

2. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

3. **Protection Orders.** A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true.

4. **Protection Orders: Injunction: Proof.** A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief.

5. **Protection Orders: Proof.** The petitioner at a show cause hearing following an ex parte protection order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect.

6. **Protection Orders: Evidence.** In harassment protection order cases, when assessing whether the evidence establishes a course of conduct that seriously terrifies, threatens, or intimidates a specific person, the evidence should be assessed on the basis of what a reasonable person under the circumstances would experience. The inquiry is whether a

reasonable person would be seriously terrified, threatened, or intimidated by the conduct at issue.

7. **Protection Orders: Proof.** In harassment protection order cases, the petitioner at a show cause hearing must prove the following material elements by a preponderance of the evidence: (1) the respondent knowingly and willfully engaged in a course of conduct directed at the petitioner that seriously terrified, threatened, or intimidated the petitioner; (2) a reasonable person under the circumstances would have been seriously terrified, threatened, or intimidated by the respondent's conduct; and (3) the respondent's conduct served no legitimate purpose.

8. ____: ____. In harassment protection order cases, a petitioner must prove at least two separate acts of harassment to establish a course of conduct within the meaning of Neb. Rev. Stat. § 28-311.02(2)(b) (Reissue 2016).

9. **Protection Orders: Time.** Under Neb. Rev. Stat. § 28-311.02(2)(b) (Reissue 2016), repeated acts of harassment need not be separated by any particular interval of time.

10. **Protection Orders: Evidence: Time.** Whether the evidence shows one continuous act of harassment or a series of separate acts of harassment is a determination to be made by the finder of fact based on all the facts and circumstances. There is no mechanical test to apply in making this determination, but evidence of breaks in the conduct, whether temporal or spatial, can be relevant to the analysis.

11. **Protection Orders: Evidence: Time: Intent.** Depending on the facts and circumstances, a series of acts of harassment can occur on the same day, at the same general location, and within minutes of one another, so long as the credible evidence shows a sufficient spatial or temporal break allowing the respondent to pause, reflect, and form the intent to engage in another act of harassment.

Appeal from the District Court for Douglas County: Horacio J. Wheelock, Judge. Affirmed.

Caitlin R. Lovell, of Johnson & Mock, P.C., L.L.O., for appellant.

Mark F. Jacobs, of Bressman, Hoffman, Jacobs & Quandt, P.C., L.L.O., for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Stacy, J.

After issuing an ex parte harassment protection order in favor of William C. Dugan (William) against Steve Sorensen, the district court conducted a show cause hearing and ordered the protection order to continue in effect. Steve appeals, arguing that the evidence was insufficient to show a "[c]ourse of conduct"[1] and that the court erred in rejecting his justification defense. Finding no merit to his assigned errors, we affirm.

## I. BACKGROUND

William and Natalie Dugan, now known as Natalie Sorensen, divorced in 2012. The decree, entered in Dodge County, awarded them joint legal custody of their two minor children and gave Natalie physical custody, subject to William's regular parenting time. In 2019, Natalie married Steve. At all relevant times, Natalie and Steve resided with the minor children in Valley, Nebraska. William continued to reside in Dodge County.

On July 22, 2024, William filed a petition and affidavit seeking a harassment protection order against Steve in the district court for Douglas County.

### 1. Petition and Affidavit

William's petition and affidavit stated that on June 13, 2024, while he was picking up his children from Natalie's home, Steve "blindsided" him in the driveway, knocking him down and "banging [his] head into the pavement in front of [his] children." After the assault, William returned to his car and called police.

William averred that while he and his children were inside his car waiting for police to arrive, Steve approached and started hitting the car window, "threatening me asking if I 'want to go again' and if I 'want to get the shit beat out of me again.'" When police arrived, they conducted interviews and reviewed a neighbor's security camera footage. William's affidavit stated that his version of events "matched the footage."

---

[1] See Neb. Rev. Stat. § 28-311.02(2)(b) (Reissue 2016).

William also averred that later that same day, when Natalie and Steve came to pick up the children at the conclusion of William's parenting time, a verbal argument ensued and escalated into yelling and name calling, and Natalie spun her vehicle's tires, "leaving 20 foot sections of rubber marks on the drive." William's affidavit described Steve as "unhinged" and expressed concern that without a protection order, there was danger William would "get blindsided every time I pick my kids up or any time I'm at their sporting events."

The court granted William an ex parte harassment protection order against Steve, and Steve filed a request for a show cause hearing.

## 2. Show Cause Hearing

Both parties appeared with counsel for the show cause hearing. The court received several exhibits, including William's petition and the neighbor's security video footage. Four witnesses testified, including William, Natalie, Steve, and the older child of William and Natalie.

### (a) William's Testimony

William testified that on June 13, 2024, he was scheduled to pick up his children for several hours of parenting time beginning at 5 p.m. When he arrived at Natalie and Steve's house shortly after 5 p.m., only the younger child was home, so William and that child waited in his car for the older child to return home.

Around 5:30 p.m., Natalie and Steve arrived home in separate vehicles. The older child was a passenger in Natalie's vehicle. Steve pulled his vehicle into the driveway first and asked William to move his car, which he did. Natalie then pulled into the driveway and parked, and William approached her vehicle, motioning for her to roll the window down. William testified that he told Natalie, "pickup time was 5:00, not 5:30," and that she started "flipping [him] off" and "hitting the windows with her hands," after which she "jumped out of

the car, slammed the door, got in my face, and started scream-ing." William expressly denied making any physical contact with Natalie during this encounter.

William said that while Natalie was yelling, Steve ran up and "blindsided" him from behind, knocking him to the ground. Steve then jumped on William and "slammed" his head into the ground "three or four times." William testified that after he was able to get up, he went to his car and called police. He also moved his car from the driveway to the street so it would be "in a public space" while he and his children waited inside the car for police to arrive.

According to William, Steve then approached William's car in the street and "slammed his hands against my driver's window telling me to get out of the car, he wanted to finish what we started." Steve also paced around the car, yelling at William. William testified that he felt threatened and intimi-dated by this conduct.

William testified that once police arrived and completed an investigation, Steve was cited for assault. William was not cited. William offered security camera footage from the neigh-bor's camera, which included audio, and it was received into evidence and played for the court.

The security camera footage is approximately 1 hour long, and it depicts events from a vantage point directly across the street from Natalie and Steve's house. The audio is somewhat garbled, so specific comments are difficult to discern. The footage depicts William approaching Natalie's parked car as she is getting out, and the two can be heard arguing. It then shows Steve running up behind William, knocking him to the ground, and pushing him into the pavement repeatedly. After the physical altercation, Steve, William, and Natalie continue to argue in the driveway for several more minutes. William can then be seen moving his car from the driveway and park-ing it in the street, along the curb. Several minutes later, Steve is seen approaching William's car and yelling something as he hits the driver's-side window while William and his children

sit inside. Police arrive thereafter and can be seen talking with people at the scene.

William testified that later that same evening, at the conclusion of his parenting time, Natalie came to pick up the children and Steve was with her. William said he felt "intimidated" by this encounter, but his testimony did not explain why.

William also testified that after the events of June 13, 2024, he felt threatened when Steve "appeared at any events for the children" where William was also present, including at public soccer games and private soccer team meetings. William admitted that Steve had attended the children's activities before the events of June 13, but he testified that in a separate contempt proceeding in Dodge County, the judge had ordered Steve "not to approach" William at the children's activities. William testified that despite this order, Steve had approached him at the children's activities, prompting William to move away. William testified that when Steve approaches him at the children's activities, he feels "like he's trying to intimidate me . . . he's trying to threaten me." William told the court that he did not feel safe when Steve was around and that he wanted a protection order so he would not feel threatened when he picked up his children or attended their events.

(b) Natalie's Testimony

Natalie testified that June 13, 2024, she messaged William at 4:30 p.m. to tell him their older child had an appointment that lasted longer than expected and that they were running late. At approximately 5:15 p.m., the child phoned William to say they were driving home and to explain why they were running late. During that call, Natalie said she overheard William yelling and calling her derogatory names. When they arrived home, she saw William pacing, "like . . . a caged animal," outside his vehicle. She told the child, "'I am so sorry. We're walking into a shit storm and hold on tight, baby, because this is going to be a big one.'"

Natalie said that after she parked her vehicle, William approached, yelling at her to get out of the car. Natalie testified that when she stepped out of the vehicle, William pushed the vehicle's door into her legs twice and then pushed her with his left arm. According to Natalie, she said, "'Don't ever fucking touch me again,'" and then she saw Steve "coming to stop the whole situation." Natalie did not describe the physical assault in any detail, but she testified that after the "initial altercation," she and William continued to argue outside his car.

Natalie also testified, over William's objection, that in her opinion, William was a violent person who had been abusive during their marriage. William expressly denied all allegations of domestic abuse.

(c) Steve's Testimony

Steve testified that when he arrived home, William was pacing in their driveway. He said William angrily approached Steve's vehicle and demanded to know where Natalie and the older child were. Steve asked William to move his car, which William did. After Steve pulled his vehicle into the garage, he saw Natalie's vehicle pull into the driveway.

Steve testified that he saw William approach Natalie's vehicle and push the vehicle's door into her leg. He also said he saw William push Natalie with his left hand, forcing her to step backward. Steve said that he was aware Natalie had experienced "domestic violence issues" with William and that when he heard Natalie say, "'Don't fucking push me ever again,'" he thought William seemed "out of control." Steve said he thought it was "necessary to intervene to end the confrontation," so he used "the least amount of physical contact to eliminate and neutralize the situation." Steve testified that once he "pushed [William] down," he thought the altercation was over and expected William to leave, but he did not.

Steve admitted that once police arrived and investigated the incident, he was charged with assault. He testified that the criminal charge was still pending at the time of the protection order hearing.

### (d) Child's Testimony

William and Natalie's older child, who was 15 years old at the time of the hearing, also testified. He said that while his mother was driving him home, he phoned his father to say they were running late. The child said his father seemed to take the news well and was "calm" on the phone, but he also testified that his father seemed "kind of upset" with his mother because he thought it was her fault they were running late. The child did not recall his father's saying anything "mean" about his mother during the call or calling her derogatory names.

The child testified that when they arrived home, his father was pacing in the driveway. After his mother parked the vehicle, his father approached and his parents began arguing. The child heard his mother say, "'Don't touch me,'" after which he saw her take a few steps backward. He then saw Steve "tackle" his father. The child said he "was really worried for everybody" and did not want anyone to get hurt.

The child testified that after Steve tackled the child's father, the two got up and "[things] settled down a little bit." The child got into his father's car with his sister while it was still parked in the driveway. He said the adults were arguing outside the car and he was worried it was "going to get physical again." His father then moved his car into the street, and they waited there for police to arrive.

On cross-examination, the son testified that he never actually saw his father touch his mother during the incident. He said he was honest with police and told them the same thing after they arrived.

### 3. Court's Rulings

At the conclusion of William's testimony, Steve moved to dismiss the ex parte protection order. He argued the evidence failed to establish a "course of conduct"[2] sufficient to support

---

[2] *Id*. (defining "[c]ourse of conduct" as "pattern of conduct composed of a series of actions of a period of time, however short, evidencing a continuity of purpose").

a harassment protection order. The court denied the motion, stating that the security video footage showed "a pattern of conduct at least for your motion."

At the conclusion of all the evidence, Steve again moved to dismiss the ex parte protection order, arguing that he had "two defenses." First, he argued that he was "justified in his use of force" because he saw "[William] assaulting and battering [Natalie]." Second, he argued that William had not met his burden of proving a course of conduct sufficient to support a harassment protection order, because the evidence showed "one altercation," rather than a series of acts. Alternatively, Steve suggested the protection order was unnecessary because there was "a no contact order already in Dodge County."

William disagreed with Steve that the evidence showed just one act of harassment. William argued, "There was the initial aggression, followed by continued aggression, followed by coming to my home, followed by further contact through the children's events." He also argued that the protection order was necessary because the order in Dodge County merely prevented Steve from being present during parenting time exchanges, but did not adequately address other contact between William and Steve.

The court announced its ruling from the bench and made its findings on the record, stating:

I reviewed the video at least three times, maybe four . . . five times, actually. . . .

. . . [I]t's very sad . . . . [Steve] perceives that [William] touched [Natalie], and at that point, proceeded to tackle him, proceeded to tackle William . . . and bash his head into the street a couple of times, three I counted. And at that point, [William] retreated to his vehicle with his children and verbal attacks were continued by [Steve] and [Natalie].

. . . .

[William] says he never touched [Natalie], and [Steve] said he saw [William] touch [Natalie]. At the end of the

day, I didn't see a touch. I find William . . . more credible than [Steve].

. . . [T]he petition and affidavit to obtain harassment protection order will be affirmed.

The court memorialized its ruling in an order entered the same day. It affirmed the harassment protection issued on July 22, 2024, and directed it to remain in effect for 1 year from that date.

Steve filed a timely notice of appeal, which we moved to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Steve assigns that the district court erred in two respects: (1) affirming the ex parte protection order when there was insufficient evidence to establish a course of conduct and (2) "implicitly finding Steve's use of force against [William] was not justified."

## III. STANDARD OF REVIEW

[1] The grant or denial of a protection order is reviewed de novo on the record.[3] In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court.[4] However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[5]

[2] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[6]

---

[3] *Diedra T. v. Justina R*., 313 Neb. 417, 984 N.W.2d 312 (2023).

[4] *Id*.

[5] *Id*.

[6] *Aguilar v. Valdez-Mendoza*, 318 Neb. 402, 16 N.W.3d 130 (2025).

## IV. ANALYSIS

Before addressing the assignments of error, we briefly review the law that governs show cause hearings in protection order cases generally, after which we review the factors that must be established to issue or affirm a harassment protection order.

[3-5] A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true.[7] A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief.[8] As such, the petitioner at a show cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order.[9] Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect.[10]

When the protection order in this case was issued and affirmed, harassment protection orders were governed by Neb. Rev. Stat. § 28-311.09 (Cum. Supp. 2024), which provided in relevant part:

> (1) Any victim who has been harassed as defined by section 28-311.02 may file a petition and affidavit for a harassment protection order as provided in subsection (3) of this section. Upon the filing of such a petition and affidavit in support thereof, the court may issue a harassment protection order without bond enjoining the respondent from (a) imposing any restraint upon the person or liberty of the petitioner, (b) harassing, threatening,

---

[7] *Diedra T., supra* note 3.

[8] *Id.*

[9] *Id.*

[10] *Id.*

assaulting, molesting, attacking, or otherwise disturbing the peace of the petitioner, or (c) telephoning, contacting, or otherwise communicating with the petitioner. The harassment protection order shall specify to whom relief under this section was granted.

(2) The petition for a harassment protection order shall state the events and dates or approximate dates of acts constituting the alleged harassment, including the most recent and most severe incident or incidents.

Section 28-311.02(2)(a), in turn, defines "[h]arass" to mean "to engage in a knowing and willful course of conduct directed at a specific person which seriously terrifies, threatens, or intimidates the person and which serves no legitimate purpose." And § 28-311.02(2)(b) defines "[c]ourse of conduct" to mean:

[A] pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including a series of acts of following, detaining, restraining the personal liberty of, or stalking the person or telephoning, contacting, or otherwise communicating with the person.

[6] We have applied an objective construction to the harassment protection order statutes, explaining that "the victim's experience resulting from the perpetrator's conduct should be assessed on an objective basis."[11] In other words, when assessing whether the evidence establishes a course of conduct that seriously terrifies, threatens, or intimidates a specific person, the evidence should "'be assessed on the basis of what a reasonable person under the circumstances would experience.'"[12] Thus, the inquiry is "whether a reasonable person would be seriously terrified, threatened, or intimidated by the conduct at issue."[13]

---

[11] *Hawkins v. Delgado*, 308 Neb. 301, 306, 953 N.W.2d 765, 769 (2021).

[12] *Diedra T., supra* note 3, 313 Neb. at 424, 984 N.W.2d at 319.

[13] *Id*.

[7] Given the statutory text governing harassment protection orders and our cases construing it, the petitioner at a show cause hearing must prove the following material elements by a preponderance of the evidence: (1) the respondent knowingly and willfully engaged in a course of conduct directed at the petitioner that seriously terrified, threatened, or intimidated the petitioner; (2) a reasonable person under the circumstances would have been seriously terrified, threatened, or intimidated by the respondent's conduct; and (3) the respondent's conduct served no legitimate purpose.

With these legal principles in mind, we turn to the assignments of error on appeal.

### 1. Course of Conduct

Steve's primary argument on appeal is that William "did not prove by a preponderance of the evidence that Steve engaged in a knowing and willful course of conduct within the scope of harassment protection order statutes."[14] Summarized, the parties disagree about whether the evidence adduced at the hearing proved one continuous act of harassment or instead proved a series of separate acts. Because the parties focus heavily on the events of June 13, 2024, we do too.

Steve argues that the events of June 13, 2024, showed a single "physical altercation" and that William "adduced no additional proof of any harassment before or after the physical altercation, which is required to prove the course of conduct which forms the basis for a harassment protection order."[15] Steve suggests that William is trying to "conjure a course of conduct by parsing out the singular, brief driveway confrontation into a series of separate acts."[16] Relying on the Nebraska Court of Appeals opinion in *Knopik v. Hahn*,[17] Steve contends

---

[14] Brief for appellant at 16.

[15] *Id.* at 12.

[16] *Id*. at 16.

[17] *Knopik v. Hahn*, 25 Neb. App. 157, 902 N.W.2d 716 (2017).

that "one isolated incident over the span of 10 to 20 minutes on one particular day [does] not amount to a course of conduct."[18]

William, on the other hand, argues the facts here are distinguishable from those considered in *Knopik.* He contends the evidence proved multiple separate acts of harassment, and he points to the court's express finding that the video showed multiple separate acts. William argues the physical assault in the driveway, and the verbal threats of more violence after William "retreated to his car,"[19] present separate acts of harassment.

The Legislature has not articulated a specific legal standard to apply in harassment protection order cases when deciding whether the evidence shows a single continuous act or a series of acts. But Nebraska appellate courts have addressed similar issues in two published opinions, one dealing with harassment protections orders and one dealing with domestic abuse protection orders. Although neither case directly addressed how courts should determine whether the evidence shows one continuous act of harassment or a series of separate acts, the reasoning from those cases is relevant here, so we discuss it in the sections that follow.

### (a) Relevant Cases

#### *(i)* Knopik v. Hahn

In *Knopik,* the petitioners sought a harassment protection order against a neighbor based on a confrontation that occurred while the neighbor was walking his dog past the petitioners' home. The neighbor's dog was on a leash, and the petitioners' dog was not. When the petitioners' dog approached and began sniffing the neighbor's dog, the neighbor began yelling aggressively and called one of the petitioners a derogatory name. The neighbor also threatened to file a lawsuit against

---

[18] Brief for appellant at 15.

[19] Brief for appellee at 7.

the petitioners "for not having the dog on a leash."[20] When one of the petitioners joked that the neighbor should have his cats on a leash, the neighbor "charged across the driveway toward [that petitioner], grabbed [him] by the sweatshirt, and punched him in the chest three times."[21] The entire confrontation lasted between 10 to 20 minutes, and the petitioners testified that the neighbor's conduct caused them to fear for their safety. The trial court issued the harassment protection order, and the Court of Appeals reversed.

In doing so, the Court of Appeals discussed two potential shortcomings in the evidence. First, it noted the confrontation "occurred within a span of 10 to 20 minutes on one particular day" and there was "[n]o evidence of harassment prior to or after [that] confrontation."[22] The Court of Appeals suggested the trial court had "split this singular, short-term incident into separate acts."[23] But it also noted that the statutory definition of "'[c]ourse of conduct'" under § 28-311.02(2)(b) refers to a series of acts over a period of time, "'however short,'"[24] and ultimately, the Court of Appeals did not reverse based on insufficient evidence of a course of conduct.

Instead, it reversed based on a determination that the neighbor's conduct did not amount to harassment as defined by the statute. The Court of Appeals reasoned that "[a]lthough [the neighbor's] actions reflect a perhaps exaggerated response to an unrestrained dog, they do not constitute the type of stalking offense necessary to support issuance of a harassment protection order."[25] Concluding there was insufficient evidence to support issuance of a harassment protection order, it reversed, and remanded with directions to vacate the protection order.

---

[20] *Knopik, supra* note 17, 25 Neb. App. at 159, 902 N.W.2d at 719.

[21] *Id*. at 160, 902 N.W.2d at 719.

[22] *Id*. at 163, 902 N.W.2d at 721.

[23] *Id*.

[24] *Id*.

[25] *Id*. at 164, 902 N.W.2d at 721-22.

*(ii)* Robert M. on behalf of
Bella O. v. Danielle O.

In *Robert M. on behalf of Bella O.*,[26] this court considered whether the evidence established a "pattern of conduct" sufficient to support a domestic abuse protection order.[27] In that case, a father petitioned for a domestic abuse protection order on behalf of his minor child, alleging the child was present when her mother went on a violent rampage at a duplex and, over the course of approximately 20 minutes, assaulted two relatives and damaged multiple items of personal property. The district court issued an ex parte domestic abuse protection order and affirmed it after a show cause hearing. On appeal, the mother argued that the evidence did not establish a "'pattern of conduct'" because it arose out of "a single incident."[28]

We agreed that a "pattern of conduct" necessarily requires proof of "multiple acts" and therefore "cannot be demonstrated by a single act,"[29] but we disagreed that the evidence showed a single act. We emphasized that during the 20-minute rampage, the mother "directed violent and aggressive behavior at multiple victims in multiple locations in the duplex and she also broke a door frame and damaged other property."[30] We concluded this "series of actions at the duplex [was] sufficient to

---

[26] *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019).

[27] See Neb. Rev. Stat. § 42-903(1)(b) (Cum. Supp. 2024) (defining "credible threat" under Protection from Domestic Abuse Act to mean "a verbal or written threat . . . or a threat implied by a pattern of conduct . . . made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family").

[28] *Robert M. on behalf of Bella O., supra* note 26, 303 Neb. at 277, 928 N.W.2d at 414.

[29] *Id.*

[30] *Id*. at 277-78, 928 N.W.2d at 415.

amount to a pattern of conduct,"[31] and we ultimately affirmed issuance of the protection order.

In *Robert M. on behalf of Bella O.*, we expressly distinguished *Knopik*, reasoning that the holding in *Knopik* ultimately turned on a determination that the neighbor's conduct did not amount to harassment. We therefore did "not read *Knopik* to have turned on whether the neighbor engaged in a single [act] or multiple acts."[32]

Despite this limitation, *Knopik* has been cited in several Court of Appeals' unpublished memorandum opinions for the general proposition that a course of conduct within the meaning of § 28-311.02(2)(b) requires "several separate occasions" of harassment.[33] And since Steve argues that the holding in *Knopik* required the district court here to view the events of June 13, 2024, as a single continuous incident, rather than "split this singular, short-term incident into separate acts,"[34] we take this opportunity to more directly address that aspect of *Knopik*.

### (iii) Limiting Knopik

To the extent *Knopik* purported to focus the "course of conduct" inquiry on whether there was more than one "incident" or "occasion" involving the parties, it was imprecise. We are aware that some states' harassment statutes incorporate

---

[31] *Id*. at 278, 928 N.W.2d at 415.

[32] *Id*.

[33] *Lethcoe v. Lethcoe*, A-24-072, 2024 WL 4889336 at *10 (Neb. App. Nov. 26, 2024) (selected for posting to court website). Accord, *Larsen v. Ference*, A-24-036, 2024 WL 4274448 (Neb. App. Sept. 24, 2024) (selected for posting to court website); *Kaufman v. Kaufman*, A-23-963, A-23-964, 2024 WL 3664483 (Neb. App. Aug. 6, 2024) (selected for posting to court website). But see *Erickson v. Swensen*, A-22-935, 2023 WL 5257937 at *5 (Neb. App. Aug. 8, 2023) (selected for posting to court website) (noting possibility that "series of acts" of harassment can occur during "a single incident lasting approximately 25 minutes").

[34] *Knopik, supra* note 17, 25 Neb. App. at 163, 902 N.W.2d at 721.

the term "separate occasions" into the statutory definition,[35] but Nebraska's statute does not. As stated, Nebraska defines "[c]ourse of conduct" to mean "a pattern of conduct composed of a *series of acts* over a period of time, however short, evidencing a continuity of purpose."[36] To the extent *Knopik* can be read to suggest that separate acts of harassment cannot occur during a single "incident" or "occasion," it is disapproved.

Moreover, *Knopik* should not be read to suggest that a physical assault, or the threat of a physical assault, cannot be an act of harassment that seriously terrifies, threatens, or intimidates a person. It is true that the stated intent of the stalking and harassment statutes is "to enact laws dealing with stalking offenses which will protect victims from being willfully harassed, intentionally terrified, threatened, or intimidated."[37] But the harassment protection statutes also expressly authorize protection orders to enjoin "threatening, assaulting, molesting, [or] attacking"[38] and thus plainly contemplate that acts of harassment can involve this conduct. To the extent *Knopik* can be read to imply that a physical assault is not the type of conduct for which the harassment protection order statutes can provide relief, it is disapproved.

Because neither *Knopik* nor *Robert M. on behalf of Bella O.* directly addressed how to prove "[c]ourse of conduct" for purposes of § 28-311.02(2)(b), we turn to that issue now.

### (b) Proving "Course of Conduct"

As stated, § 28-311.02(2)(b) defines "[c]ourse of conduct" to mean "a pattern of conduct composed of a series of acts over

---

[35] See, e.g., *State v. Kintz*, 169 Wash. 2d 537, 551, 238 P.3d 470, 477 (2010) (noting that Washington's stalking statute requires person to "intentionally and repeatedly harass[]" or "repeatedly follow[]" another and defines "'repeatedly'" to mean "'two or more separate occasions'").

[36] § 28-311.02(2)(b) (emphasis supplied).

[37] § 28-311.02(1).

[38] § 28-311.09(1).

a period of time, however short, evidencing a continuity of purpose," but it does not further define "pattern of conduct" or "series of acts." We therefore give both phrases their plain and ordinary meaning.[39]

[8] Other courts construing the plain meaning of similar statutory language have held that it requires evidence of at least two acts of harassment.[40] This is consistent with our statement in *Robert M. on behalf of Bella O.* that "a pattern of conduct cannot be demonstrated by a single act."[41] We now expressly hold that in harassment protection order cases, a petitioner must prove at least two separate acts of harassment to establish a course of conduct within the meaning of § 28-311.02(2)(b).

Having clarified that a course of conduct requires proof of at least two separate acts of harassment, we turn to the parties' arguments about whether the evidence in this case established

---

[39] *Hawk v. Hawk, ante* p. 120, 129, ___ N.W.3d ___, ___ (2025) ("[s]tatutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning").

[40] See, e.g., *Martinez v. Estes*, 258 Ariz. 354, ¶ 8, 557 P.3d 788, 791 (Ariz. App. 2024) (holding "'[a] series of acts means at least two events'" and requires repeated acts of harassing conduct directed at same person); *Daoang v. Perry*, 155 Haw. 157, 165, 557 P.3d 886, 894 (2024) (holding "a single act does not constitute a 'course of conduct'" sufficient to meet statutory definition of harassment); *Garcia v. Soto*, 337 So. 3d 355, 360 (Fla. App. 2022) (holding two or more acts of harassment are required to prove "'"pattern of conduct composed of a series of acts over a period of time, however short,"'" but "'[t]wo or more acts that are part of one continuous course of conduct are legally insufficient to qualify as separate instances of harassment'"); *Levy v. Jacobs*, 69 So. 3d 403, 405 (Fla. App. 2011) (holding that two attacks occurring 5 minutes apart on same premises were "two incidents of violence" because they occurred in different locations and evidence showed "a sufficient temporal break to allow [respondent] time to pause, reflect, and form a new intent before the second attack").

[41] *Robert M. on behalf of Bella O., supra* note 26, 303 Neb. at 277, 928 N.W.2d at 414.

one continuous act or instead established at least two acts of harassment.

Steve does not dispute that a physical assault can be an act of harassment, but he argues that the events of June 13, 2024, involved a "brief driveway confrontation,"[42] and, therefore, it must be viewed as a single act. William argues that even if the confrontation was brief, it involved separate and distinct acts of harassment. To the extent Steve posits that a brief confrontation cannot give rise to a course of conduct involving more than one act of harassment, we disagree.

[9] Some states' statutes require that acts of harassment must be separated by a defined period of time or must occur within a defined timeframe,[43] but Nebraska's statute does not. When construing statutes, courts strive, if possible, to give effect to all parts of a statute such that no sentence, clause, or word is rendered meaningless.[44] Construing § 28-311.02(2)(b), we must give effect to the phrase "over a period of time, no matter how short." Because this phrase modifies both "pattern of conduct" and "series of acts," it would be inconsistent with the plain meaning of this phrase to require that repeated acts of harassment be separated by any particular interval of time. Under Nebraska's statutory scheme, it is possible for multiple acts of harassment to occur within a short period of time.

[10] Ultimately, whether the evidence shows one continuous act of harassment or a series of separate acts of harassment is a determination to be made by the finder of fact based

---

[42] Brief for appellant at 16.

[43] See, e.g., Ark. Code Annot. § 5-71-229(d)(1)(A) (LexisNexis Supp. 2009) (defining "'[c]ourse of conduct'" to mean "pattern of conduct composed of two (2) or more acts separated by at least thirty-six (36) hours, but occurring within one (1) year"); Minn. Stat. § 609.749, subd. 5(b) (2024) (defining "'stalking'" to require "two or more acts within a five-year period").

[44] *In re Guardianship of Eliza W.*, 304 Neb. 995, 938 N.W.2d 307 (2020).

on all the facts and circumstances.[45] There is no mechanical test to apply in making this determination,[46] but evidence of breaks in the conduct, whether temporal or spatial, can be relevant to the analysis.

For instance, in *Levy v. Jacobs*,[47] the Florida Court of Appeals considered whether the evidence in a protection order appeal showed one continuous assault or multiple assaults. Florida statutes authorize protection orders for stalking[48] and for "'[r]epeat violence,'"[49] and define repeat violence as "two incidents of violence or stalking committed by the respondent, one of which must have been within 6 months of the filing of the petition."[50] The parties in *Levy* lived in the same condominium building and got into an argument outside the building entrance, during which the victim was punched in the chest. He went into the building to talk with the desk clerk about calling police, and, about 5 minutes later, the attacker entered the building, yelling and cursing, and grabbed the victim by the neck, threw him to the floor, and threatened to hit him if he stood up. Based on these events, the victim obtained a repeat violence protection order. The attacker appealed,

[45] See, e.g., *Nicholson v. State*, 963 N.E.2d 1096, 1103 (Ind. 2012) (holding that absent explicit timeframe established by stalking statute, course of conduct can occur "over a matter of minutes or years" and it is for trier of fact to determine whether evidence shows repeated or continuing harassment); *Kintz, supra* note 35, 169 Wash. 2d at 553, 238 P.3d at 478 (holding fact finder determines whether evidence showed two or more "separate occasions" of following or harassing within meaning of stalking statute).

[46] See *State v. Richardson*, 633 N.W.2d 879, 888 (Minn. App. 2001) (stating "[t]he determination of whether multiple offenses constitute a single behavioral act is not, however, a mechanical test, but requires an examination of all the facts and circumstances").

[47] *Levy, supra* note 40.

[48] See Fla. Stat. Ann. § 784.0485 (West Cum. Supp. 2025).

[49] See Fla. Stat. Ann. § 784.046 (West 2017).

[50] § 784.046(1)(b).

arguing the evidence showed only a single violent incident. The appellate court disagreed and affirmed the protection order, reasoning:

Although the two attacks occurred on the same premises, the first occurred outside the building and the second occurred inside the building. . . . [I]n addition to occurring in different locations, there was a temporal break of approximately five minutes between the incidents. This was a sufficient temporal break to allow [the attacker] time to pause, reflect, and form a new intent before the second attack.[51]

The Vermont Supreme Court applied similar reasoning in *Beatty v. Keough.*[52] In *Beatty*, the petitioner and respondent worked in the same building. They had a verbal confrontation inside the building during which the respondent forcefully pressed her hand against the petitioner's face. The petitioner then left the building and walked out to his vehicle, and the respondent followed him, yelling and spitting in his direction. The trial court issued an antistalking protection order, and the supreme court reversed, concluding the evidence did not show a course of conduct sufficient to support an antistalking protection order under a statute requiring evidence of "'two or more acts over period of time, however short.'"[53] The court reasoned:

As a general matter, the question of whether there are "two or more acts" presents a question of fact for the trial court to resolve, considering all of the circumstances. In this case, however, we conclude, as a matter of law, that the evidence shows only a single continuing incident. While the parties' confrontation began in one area and

---

[51] *Levy, supra* note 50, 69 So. 3d at 405.

[52] *Beatty v. Keough*, 217 Vt. 134, 287 A.3d 54 (2022).

[53] *Id*. at 136, 287 A.3d at 56. See Vt. Stat. Ann. tit. 12, § 5131(1) (Cum. Supp. 2015).

continued into a different area, there was no break in the conduct. Plaintiff testified, and the court found, that after striking plaintiff, defendant followed him out of the work building to the parking lot. She continued to yell at him while she followed him, and she then spit at him. We find it clear, as a matter of law, given the sequence of events testified to by plaintiff, that the spitting and the striking were part of a single escalating episode, not two sufficiently distinct events. Thus, because the evidence here is insufficient to show "two or more acts over a period of time, however short," we must reverse the trial court's decision.[54]

[11] These cases illustrate that, depending on the facts and circumstances, a series of acts of harassment can occur on the same day, at the same general location, and within minutes of one another, so long as the credible evidence shows a sufficient spatial or temporal break allowing the respondent to pause, reflect, and form the intent to engage in another act of harassment.[55]

Applying these considerations here, our de novo review of the record convinces us that William proved at least two acts of harassment. In conducting that review, we consider that the trial court found William's testimony to be more credible. William's testimony about the assault in the driveway was corroborated by the security camera footage, which shows that Steve tackled William from behind, threw him to the ground, and pushed him into the pavement multiple times. William testified that he felt threatened by this attack, and we conclude that a reasonable person would also have felt threatened by such conduct.

---

[54] *Id*. at 142, 287 A.3d at 60.

[55] See, also, Annot., 14 A.L.R.7th Art. 4, § 2 at 183 (2016) (collecting cases and observing that civil stalking statutes generally require course of conduct consisting of two or more acts, but "[m]ultiple contacts can occur on a single day . . . as long as they are sufficiently distinct").

The footage also corroborates William's testimony that after the attack in the driveway, he got up and eventually retreated to his car to call police. William then backed his car out of the driveway and parked in the street to wait for police to arrive. Several minutes later, Steve approached William's car in the street, hit the driver's-side window, and made verbal threats to "finish what we started." William testified that he felt threatened and intimidated by this conduct, and we conclude that a reasonable person would feel the same, especially after being physically attacked in the driveway.

On this record, the spatial and temporal break in Steve's conduct between the physical assault that occurred in the driveway and the verbal threat that occurred several minutes later in the street was sufficient to allow Steve to pause, reflect, and form the intent to engage in another act of harassment. Because we conclude this evidence established at least two separate acts of harassment, there is no need to consider whether the evidence also established other acts of harassment. An appellate court is not obligated to engage in analysis that is not needed to adjudicate the controversy before it.[56]

The district court did not err in determining there was sufficient evidence of a course of conduct to warrant a harassment protection order.

## 2. JUSTIFICATION

In his second assignment of error, Steve argues he was legally justified in using force against William because he believed it was "necessary to protect his wife."[57] He contends that his conduct was justified under Neb. Rev. Stat. § 28-1410 (Reissue 2016), and thus, it "cannot form the basis for a harassment protection order."[58]

---

[56] *In re Estate of Harchelroad*, 318 Neb. 573, 18 N.W.3d 103 (2025).

[57] Brief for appellant at 14.

[58] *Id*.

We have not previously addressed whether claims of justification, whether based on self-defense under Neb. Rev. Stat. § 28-1409 (Reissue 2016) or defense of others under § 28-1410, have any proper application in harassment protection order proceedings. In his appellate brief, Steve offers no statutory or case law support for his contention that a viable defense of justification precludes issuance of a harassment protection order under Nebraska law, and we are aware of none.

Neb. Rev. Stat. § 28-1416 (Reissue 2016) provides that justification is an affirmative defense in criminal prosecutions, and it also states that justification "shall be available in any civil action for assault and battery or intentional wrongful death, and, where applicable, shall be a bar to recovery." But civil protection order proceedings are not mentioned in § 28-1416, and thus, they do not fall within any of the categories of civil action where the Legislature has expressly made justification an available defense.

At oral argument before this court, Steve suggested that even if Nebraska's justification statutes are not expressly available in civil protection orders under § 28-1416, a viable claim of justification may nevertheless be relevant to determining whether the conduct at issue satisfies the statutory definition of "[h]arass," which includes a requirement that the conduct "serves no legitimate purpose."[59] We express no opinion on Steve's alternative legal theory because it was not one he presented to the district court. Before the district court, Steve argued the justification statutes provided him with a complete defense; he did not argue the court should consider his justification claim when determining whether his conduct served no legitimate purpose. As a general matter, appellate courts will not consider an argument or theory raised for the first time on appeal.[60]

---

[59] § 28-311.02(2)(a).

[60] *Saylor v. State*, 315 Neb. 285, 995 N.W.2d 192 (2023).

On this record, the district court did not err in impliedly rejecting Steve's justification defense.

## V. CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.