IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CHELSEA K. ON BEHALF OF CARSYN R. V. FRANKLYN R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHELSEA K. ON BEHALF OF CARSYN R., APPELLEE,

V.

FRANKLYN R., APPELLANT.

TERRA F. ON BEHALF OF MCKALEY R., APPELLEE,

V.

FRANKLYN R., APPELLANT.

Filed November 18, 2025.    Nos. A-25-150, A-25-151.

Appeals from the District Court for Richardson County: JULIE D. SMITH, Judge. Affirmed.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Morgan T. Homolka, of Ligouri Law Offices, for appellees.

PIRTLE, WELCH, and FREEMAN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

At issue are two separate domestic abuse protection orders entered against Franklyn R. in the district court for Richardson County. Franklyn challenges the district court's finding in each case that there was sufficient evidence to support the protection orders. In one of the appeals, he also asserts that any force used was a privileged use of force in self-defense under Neb. Rev. Stat. § 28-1409 (Reissue 2016). These two cases have been consolidated for appeal. For the reasons set forth herein, we affirm both district court orders.

- 1 -

## II. BACKGROUND

### 1. Petition and Order To Show Cause In Case No. A-25-150

On January 21, 2025, Chelsea K. filed a petition and affidavit on behalf of her minor child, Carsyn R., against Franklyn pursuant to Neb. Rev. Stat. § 42-924 (Cum. Supp. 2024). Franklyn is Carsyn's father and Chelsea and Franklyn share custody of Carsyn.

Chelsea's petition and affidavit alleged that on January 19, 2025, at approximately 6:19 p.m., Carsyn, a 14-year-old, notified Chelsea that his father had bitten him. Chelsea then called Franklyn and asked what had happened. Franklyn responded that Carsyn was with him in the bedroom, when Carsyn began choking him and he had to bite him to get him off. Chelsea then spoke to Carsyn, who told her that Carsyn was sitting on the edge of Franklyn's bed, and Franklyn was nudging Carsyn with his leg/foot. Carsyn grabbed Franklyn's leg to get Franklyn to stop, when Franklyn bit him on the arm two times. Chelsea stayed on the phone with Carsyn through the evening. Twice during the evening, Franklyn called Chelsea to see what he could do about the situation. Franklyn told Chelsea that Carsyn had said he was going to "tell the cops." The next day Carsyn went to the counselor's office at his school, and Child Protective Services (CPS) was notified. An officer came to the school and talked to Carsyn about the incident. Carsyn left school shortly after this as he was still shaken up. When he arrived home, he showed Chelsea his arm again and some of the skin was peeling and Carsyn stated his arm was sore. On January 21, the district court issued an order to show cause and notice of hearing to be served on Franklyn.

### 2. Petition and Ex Parte Order in Case No. A-25-151

On January 21, 2025, Terra F. filed a petition and affidavit on behalf of her minor child, McKaley R., against Franklyn pursuant to § 42-924. Franklyn is McKaley's father and Terra and Franklyn share custody of McKaley.

Terra's petition and affidavit alleged that on January 19, 2025, Terra was notified by Franklyn's other daughter, Miranda, that there was a physical altercation involving McKaley, a 2-year-old. The next morning, when Franklyn dropped off McKaley at Terra's home, he made no mention of any problems. Carsyn then called Terra on FaceTime and informed her that Franklyn had bitten McKaley the night before. Terra checked McKaley over and found a bite mark bruise on the inner left ankle. Terra then contacted CPS, and the sheriff's department contacted her and came to her house. An officer took photos of McKaley's injuries and McKaley informed the officer that "Daddy bite" while pointing to her ankle and "Bubba owie" as she pointed to her arm.

The district court granted McKaley an ex parte domestic abuse protection order. Franklyn requested a show cause hearing on the protection order granted for McKaley, which was held at the same time as Carsyn's hearing.

### 3. Show Cause Hearing

A show cause hearing occurred on February 4, 2025. During the hearing, both Chelsea and Terra testified, as did the deputy sheriff who investigated the incident. Franklyn also testified on his behalf.

### (a) Franklyn

Franklyn testified he is the father of Carsyn and McKaley. On January 18, 2025, Franklyn had parenting time with the two children. Franklyn was discussing plans for the next day with Carsyn. Franklyn was planning on taking Carsyn and McKaley to Legoland in Kansas City. Franklyn stated that Carsyn seemed excited about going on the trip until he realized McKaley would be going as well. At that point, Carsyn wanted to stay home, but Franklyn told Carsyn that he could not stay home and play on his gaming laptop instead. The next morning, Carsyn was playing on his laptop and Franklyn told him to turn it off and he refused. Franklyn stated that after a discussion with Chelsea, he took Carsyn's gaming laptop away and that Carsyn was mad when he realized that Franklyn had hidden it.

Franklyn testified that they were delayed leaving his home and did not end up going to Legoland in Kansas City, but that they did go to Topeka and Lawrence. He said that when they returned home, Carsyn immediately asked for his gaming laptop, but Franklyn did not give it to him. Franklyn testified that Carsyn went to his bedroom, while he and McKaley were watching TV in his bedroom. Franklyn testified that while he was lying down on his bed with McKaley cradled in his arm, Carsyn came back into the room and demanded his gaming laptop. When Franklyn told him "no" twice, Carsyn "got mad" and went to the edge of the bed, jumped on top of Franklyn, and began choking him. Franklyn stated that Carsyn straddled him with his knees in his stomach and Carsyn had his hands around his neck.

Franklyn said that as he attempted to free himself from Carsyn, he accidentally bit McKaley instead of Carsyn. Franklyn testified that he was unable to see he was biting McKaley instead of Carsyn because Carsyn had pushed McKaley up over his eyes. Franklyn said that he was trying to bite Carsyn because it was the only way he could attempt to get Carsyn off him, as he could not move his arm, could not breathe, could not see, and could not move around, since pillows and blankets surrounded him. Franklyn said that Carsyn eventually let up after he bit his arm. After he was free, Franklyn checked on McKaley, but while he was checking on her, Carsyn came up behind him and began choking him again to the point where he almost blacked out. Franklyn said that he grabbed Carsyn's hand and bit down harder to get away from him.

Franklyn testified that he had recently had gallbladder surgery and had pain in both the right and left side of his body. Franklyn said that because of his physical condition, he was unable to defend himself and had to bite Carsyn to get him off. Franklyn testified that he felt like he had no other option than to bite Carsyn and had no intention of harming McKaley. Franklyn said that he had never had an instance like this with Carsyn before, but Carsyn does get mad when his gaming laptop is taken away. Franklyn testified that Carsyn has "ADHD" and that several weeks prior to the incident he and Chelsea had a conversation about Carsyn's behavior. Franklyn stated that Chelsea told him Carsyn was out of control, was locking himself in his room, and was being aggressive.

During cross-examination, Franklyn said that he did not know if Carsyn was using both of his hands when he was choking him. He also testified that at the time of the incident he was back to work doing physical farm labor after his recent surgery. Franklyn stated that he was quite a bit bigger than Carsyn but was unable to get Carsyn off him during the incident. Franklyn stated that his throat and neck did not hurt after the altercation and he did not have any marks on his neck, as

he did not look afterward. He testified that he never looked in a mirror for marks on his throat nor did he have anybody look for him.

## (b) Chelsea

Chelsea is the mother of Carsyn and shares custody with Franklyn. Chelsea testified that Franklyn called her and told her that Carsyn had jumped on him and choked him, and that Franklyn bit him in self-defense. Franklyn also told Chelsea that he did not believe he bit Carsyn that hard and that he wanted to know "what he could do." Chelsea described his tone of voice as low and frantic.

Chelsea testified that she knew Franklyn well, having known him for 17 years and sharing 2 children with him. Chelsea said that Franklyn reacts in emotional ways and was worried that if she picked up Carsyn that night that her presence would make things worse. Chelsea stayed on the phone with Carsyn through the night as she was worried about Carsyn. The next day Carsyn showed Chelsea his injuries and told her that he was in pain. Chelsea said that Carsyn had never been violent toward her or anyone else, that they had a good relationship, and Carsyn was generally truthful. Chelsea stated that Carsyn had been acting differently since the incident and that it had an emotional impact on him. Chelsea took photographs of Carsyn's injuries the day after the incident and then again two days after, to show the bruising. The photos were offered and admitted into evidence.

Chelsea stated she had informed Franklyn four weeks before this event occurred that Carsyn had been misbehaving by shutting himself in the bedroom, but that Carsyn had not been physically violent. Chelsea said she spoke to Carsyn over FaceTime and although he seemed upset about having to leave the house for the Kansas trip, he had never been violent. However, Chelsea testified that Carsyn admitted to choking his father after Franklyn bit him.

## (c) Terra

Terra testified that she is the mother of McKaley and has a custody arrangement with Franklyn. Terra stated that McKaley was with Franklyn on January 19, 2025, for his scheduled parenting time. Terra said that when Franklyn brought McKaley back to her house the next morning, Franklyn did not make Terra aware that an incident occurred that caused McKaley injury. Once Terra became aware, she promptly looked McKaley over for injuries and located a bite mark bruise on McKaley's left ankle. After observing the bite mark, Terra contacted law enforcement and an officer came to her residence.

Terra stated that she knew Franklyn well, having been with him for a few years and sharing McKaley with him. Terra said that Franklyn gets angry easily and has emotional outbursts, which include yelling and cussing, which makes her afraid to be around him. Terra stated that she had seen Franklyn get physical with McKaley before, and that Franklyn had bitten Terra previously. Terra said that in 2023, Franklyn grabbed McKaley from a car seat, and Terra and Franklyn had an altercation, where Franklyn bit her. Terra testified that she is worried about McKaley's safety with Franklyn.

### (d) Dexter Holliday

Richardson County Deputy Sheriff Dexter Holliday was working on January 20, 2025, and was dispatched to Carsyn's school to talk to Carsyn. He testified he was called to talk to Carsyn, who disclosed to him the incident that occurred at Franklyn's residence. Holliday took photos of Carsyn's left arm the day after the incident.

On January 21, 2025, Holliday interviewed Franklyn. Franklyn told him that he had been "horseplaying" with Carsyn, but Carsyn got upset and then began to choke him. Holliday testified that he observed no injuries on Franklyn and that Franklyn did not complain of any injuries. Holliday also observed that Franklyn was larger than Carsyn and appeared to weigh more than Carsyn. Holliday testified that throughout his investigation, Franklyn's story did not match Carsyn's injuries.

Holliday also learned that McKaley was bitten in this interaction. Holliday went to Terra's home to speak with Terra and was able to examine McKaley's injuries. Holliday testified that he observed a bruise caused by biting when he examined McKaley's leg.

Holliday stated that Carsyn was interviewed at the Child Advocacy Center and he was able to view these interviews. Holliday testified that Carsyn's disclosures during his interviews matched his injuries. Holliday said that during the interview Carsyn disclosed that Franklyn was the initial aggressor. Carsyn had also disclosed that the bite mark caused him pain and based on Holliday's observations, the bites caused Carsyn serious bodily harm. Although Holliday testified that it was unclear to him how McKaley got her injury, he stated that the evidence supported Carsyn's version of events.

### 4. DISTRICT COURT'S ORDERS

Following the show cause hearing, the district court entered orders granting the domestic abuse protection order for Carsyn and affirming the ex parte domestic abuse protection order for McKaley.

In granting the protection order in favor of Carsyn, the court found that the injuries to Carsyn as shown in the photographs were excessive and unnecessary to protect Franklyn from his son. The court also found that Franklyn was not credible in his version of events.

In affirming the protection order in favor of McKaley, the court found that Franklyn did not act in self-defense in causing the injuries to Carsyn. The court also found that since both children had bite marks inflicted by Franklyn on the same date that it was more likely that the injuries were intentional rather than accidental.

## III. ASSIGNMENTS OF ERROR

In case No. 25-150, Franklyn assigns, restated, that the district court erred in two respects: (1) finding that there was sufficient evidence to support the protection order and (2) finding that he did not act in self-defense under § 28-1409.

In case No. 25-151, Franklyn assigns, restated, that the district court erred in finding there was sufficient evidence to support the affirmance of the protection order.

## IV. STANDARD OF REVIEW

The grant or denial of a protection order is reviewed de novo on the record. *Dugan v. Sorensen*, 319 Neb. 326, 22 N.W.3d 623 (2025). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018).

## V. ANALYSIS

Before addressing the assignments of error, we briefly review the law that governs show cause hearings in protection order cases generally, after which we review the factors that must be established to issue or affirm a domestic abuse protection order.

A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Dugan v. Sorensen, supra.* A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief. *Id.* As such, the petitioner at a show cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Id.* Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect. *Id.*

According to the Protection from Domestic Abuse Act (the Act), Neb. Rev. Stat. § 42-901 et seq. (Reissue 2016 & Cum. Supp. 2024), "[a]ny victim of domestic abuse" may seek a domestic abuse protection order. See § 42-924(1)(a). We note that the Act was recently changed, effective September 3, 2025, to the Protection Orders Act. See 2025 Laws, L.B. 80. For purposes of this opinion, we will apply the law of the Act, which was effective during the relevant time period.

Whether domestic abuse occurred is a threshold issue in determining whether an ex parte protection order should be affirmed; absent abuse as defined by § 42-903 (Cum. Supp. 2024), a protection order may not remain in effect. See *Maria A. on behalf of Leslie G. v. Oscar G., supra.*

For purposes of the Act, "[a]buse" is defined by § 42-903(1) as the occurrence of one or more of the following acts "between family or household members:"

> (a)    Attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument;
> (b)    Placing, by means of credible threat, another person in fear of bodily injury . . . or
> (c) Engaging in sexual contact or sexual penetration without consent as defined in section 28-318.

### 1. CASE NO. A-25-150

Franklyn assigns in case No. A-25-150 that there was insufficient evidence to support the granting of a domestic abuse protection order. Franklyn also assigns that his biting of Carsyn is

privileged as self-defense under § 28-1409 and therefore a protection order cannot be issued against him.

The petitioner at a show cause hearing has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Maria A. on behalf of Leslie G. v. Oscar G., supra.* During the show cause hearing, testimony and evidence was adduced that Franklyn intentionally and knowingly caused bodily injury to Carsyn. Franklyn, however, claimed that he did not intentionally and knowingly cause bodily injury to Carsyn as he was acting in self-defense when he bit Carsyn. On de novo review, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Torres v. Morales*, 287 Neb. 587, 843 N.W.2d 805 (2014).

We agree with the district court's determination that Franklyn lacked credibility. Franklyn's story about the incident changes from "horseplaying" to a violent assault, where Carsyn, a 14-year-old, became so mad that he attempted to choke Franklyn twice, even after being bitten the first time. There is also evidence that Franklyn was larger in size, and that despite having surgery recently, Franklyn was able to continue to do farm labor. Carsyn told Holliday that Franklyn was the initial aggressor, and Holliday testified that the evidence was more aligned with Carsyn's version of events. There is sufficient evidence to support the finding that Franklyn bit Carsyn after Carsyn attempted to get Franklyn to stop nudging Carsyn's leg/foot, as alleged in the petition and affidavit, and Franklyn did so knowingly and intentionally.

Considering all this evidence, we find that the record sufficiently shows that Franklyn intentionally and knowingly caused bodily injury to Carsyn as set forth in § 42-903(1)(a). We conclude that the district court did not err, and there was sufficient evidence to support the protection order.

Next, Franklyn assigns that the district court erred in not considering his actions privileged as self-defense. Franklyn asserts that any force used against Carsyn was a privileged use of force in self-defense under § 28-1409. However, Neb. Rev. Stat. § 28-1416 (Reissue 2016) provides justification as an affirmative defense in criminal prosecutions and in civil actions for assault, battery, or intentional death, to bar recovery. See *Dugan v. Sorensen*, 319 Neb. 326, 22 N.W.3d 623 (2025). Civil protection order proceedings are not mentioned in § 28-1416, and thus, they do not fall within any of the categories of civil action where the Legislature has expressly made justification an available defense. *Dugan v. Sorensen, supra.* We conclude that the district court did not err in finding that Franklyn's actions were not privileged as self-defense.

### 2. Case No. A-25-151

Franklyn assigns in case No. A-25-151 that there was insufficient evidence to support the affirmance of the domestic abuse protection order.

As mentioned above, the petitioner at a show cause hearing bears the burden of proving by a preponderance of the evidence the truth of the facts to support a protection order. See *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018). During the show cause hearing, testimony and evidence was adduced that Franklyn intentionally and knowingly caused bodily injury to McKaley by biting her. Franklyn claimed that he did not intentionally and

knowingly cause bodily injury to McKaley, but rather the bite was accidental as he mistakenly bit McKaley, while trying to free himself from Carsyn.

While the circumstances surrounding McKaley's injury are unclear, a 2-year-old was bitten by her father, on the same evening he bit his 14-year-old son. Although Franklyn claims it was accidental, there was testimony that he had been physical with McKaley before and had bitten McKaley's mother.

Considering all the evidence, we find that the record sufficiently shows that Franklyn intentionally and knowingly caused bodily injury to McKaley as set forth in § 42-903(1)(a). We conclude that the district court did not err, and there was sufficient evidence to support the affirmance of the protection order.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's issuance and renewal of the domestic abuse protection orders.

AFFIRMED.