IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

VANCE V. PETERSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TAYLOR J. VANCE, APPELLEE,

V.

DOMINICK PETERSON, APPELLANT.

Filed January 20, 2026.    No. A-25-317.

Appeal from the District Court for Scotts Bluff County: RANDIN R. ROLAND, Judge. Affirmed.

William E. Madelung, of Madelung Law Office, P.C., L.L.O., for appellant.

Maren Lynn Chaloupka, of Chaloupka Law, L.L.C., for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Dominick Peterson appeals from the Scotts Bluff County District Court's order granting Taylor J. Vance a harassment protection order against him. We affirm.

## BACKGROUND

On August 7, 2024, Vance filed a pro se form petition and affidavit to obtain a sexual assault protection order against Peterson pursuant to Neb. Rev. Stat. § 28-311.11 (Cum. Supp. 2024). We note that § 28-311.11 has since been repealed by 2025 Neb. Laws, L.B. 80, § 52. There is now a Protection Orders Act, Neb. Rev. Stat. § 26-101 et seq. (Supp. 2025), which became effective on September 3, 2025. Since the Protection Orders Act was not yet in effect when the protection order was entered in this case, we will rely upon the statutory scheme in effect at the time.

- 1 -

In the form petition and affidavit, Vance gave her address in Gering, Nebraska, and an address in Scottsbluff, Nebraska, for Peterson. In the section of the form petition and affidavit asking for "[t]he date(s) or approximate date(s) and event(s) and the most severe incident or incident(s) of sexual assault toward the person seeking protection," Vance alleged as follows:

A. Date/Time: April 2024-June 2024 Description: Sexual Harassment & Stalking[.] He added me on snapchat, I didn't really think anything about it because he was a family friend and we both worked in EMS. And then he started asking me for very explicite [sic] pictures. I told him No[,] he continued to ask and I kept telling him No and the [sic] he needed to respect my boundaries and my wishes because I was in a very happy relationship; he stated "he doesn't have to know about anything, nobody does" and I said no sto [sic] asking. I'm done playing games.

B. (If needed) Date/Time: July 12th 2024 10:30 am Description: Kiddie Parade OT Days[.] Waiting on a family member after the parade. Dominick approached me gave me a hug and kept trying to touch me. I asked him to please stop touching me and to get off of me so that I could leave and get to work he kept refusing and telling me to stop causing a scene. I finally got away from him and blocked him on everything so that he couldn't contact me. He still continues to drive past my house all the time.

C. (If needed) Date/Time: [blank] Description: I'm afraid he will come after me and harm me or try to touch me in bad places.

I filed a police report through Gering Police department July 31st. At this time the State Patrol has my case.

He constantly asked me to stay the night at his house and I would just say No, I don't know where you live and I don't want to anyways so please stop asking me because the answer is always going to be No. No matter what question you are asking me, to spend the night or for pictures the answer is No and always will be. If you can't respect my boundaries then there is the door. I told you that from the beginning. Now he drives by my house and my parents['] house at least 3 times a week.

On August 8, 2024, the district court entered an "Order to Show Cause Sexual Assault Protection Order," ordering that Peterson "may appear and show cause, if any there be, why a Sexual Assault Protection Order should not be issued . . . as requested by the petitioner." The court also stated, "A court, on its own motion or at the request of the petitioner, may treat a petition for a sexual assault protection order as a petition for a domestic abuse protection order or a harassment protection order if it appears from the facts that such other protection order is more appropriate." (This notification is consistent § 28-311.11(7)). A show cause hearing on the matter was set for August 23, 2024.

On August 12, 2024, Vance, through newly retained counsel, filed a motion to continue because counsel had a pre-existing scheduling conflict. On August 14, Peterson's initial attorney filed his entry of appearance. On August 15, the district court granted Vance's motion to continue, and the show cause hearing was set for September 30.

In an October 4, 2024, "Journal Entry and Order *Nunc Pro Tunc*," the district court stated there had been a September 18 hearing on "the Rule 34A Notice and Proposed Subpoena submitted by [Vance] and the Objection filed by [Peterson]." At the hearing, the court addressed the current

"trial date," and "[c]ounsel for both parties agreed the trial needed continued"; "[t]rial was continued." A status hearing was scheduled for November 7. Following the November status hearing, the court ruled on Peterson's objections and another status hearing was set for January 13, 2025.

On January 2, 2025, Peterson filed a "Notice of Discharge," notifying the district court and Vance that he had "voluntarily released and discharged" his attorney and would seek alternative counsel. In its January 3 "Journal Entry and Order Granting Discharge," the court stated that Peterson was aware the case was set for a status hearing on January 13. Peterson may seek alternative counsel, "or proceed pro se." In its January 14 "Journal," the court noted that Peterson did not appear at the January 13 status hearing; the case was set for a February 20 "trial."

On February 20, 2025, Peterson's current counsel filed his entry of appearance, and Peterson filed a motion to continue the show cause hearing scheduled for that same day "to give [counsel] adequate time to prepare his case." The motion to continue was denied.

The show cause hearing on the protection order was held on February 20 and 28, 2025. Vance and Peterson both appeared with counsel. Vance testified that she originally requested a sexual assault protection order because "[t]hat's what the people at the office" in the courthouse gave her. However, she was not claiming that Peterson physically sexually assaulted her, and she asked the district court to treat her petition like a request for a harassment protection order.

Vance testified that she was currently 25 years old. She was a special education "para" at an elementary school and an EMT with the Gering fire department. She first met Peterson on an EMT call (no date specified), while she was taking care of a patient and Peterson was a police officer; she did not talk to Peterson directly at that call, she just knew who he was.

Vance's first conversation with Peterson was at a track meet in April 2024. Vance was there as a para and was "[o]n the field getting ready to help one of [her] students." Peterson was in his uniform when he approached her and said, "'You only moved out because your dad hates you.'" (Peterson testified that he knew Vance's parents and he "poured concrete with her dad and her grandfather.") Vance "was shocked," but said, "'I need to go. I have kids that need to run their events.'"

Three days later, Peterson sent her a "friend request" on Facebook and Instagram (although during cross-examination, Vance stated that she accepted Peterson's friend requests on Facebook and Instagram "before April" 2024), and he "added" her on Snapchat. Vance confirmed that she accepted Peterson's friend requests, as well as the "add" on Snapchat. When she first saw Peterson's friend requests and Snapchat add, Vance "didn't really think anything of it" and "just thought it was professional because we both work in EMS." She answered affirmatively when asked if she had Snapchat friends that were not her close friends and were "professional colleagues or people who are a few circles out of friends."

Vance stated that Peterson began sending her Snapchats. At first, the Snapchats Peterson sent were friendly, and he sent "[v]ideos and pictures of his dogs." But then he "started sending shirtless pictures" of himself. Vance "either wouldn't respond or [she] would have [her] boyfriend respond"; her boyfriend would take her phone and send Peterson a "picture of either just him or a picture of us together." Vance stated that Peterson then began sending "[s]hower pictures"; the pictures did not include his genitals, but Vance knew they were shower pictures because she "could see the showerhead and the water." The pictures made Vance "uncomfortable." Next, Peterson

"started sending crotch pictures" (he was wearing shorts) and wrote, "'I want to see you,'" "'I want to see all of you,'"; Vance took these messages to mean that Peterson wanted to see her naked or wanted nude pictures of her. When asked how many times Peterson said he wanted to see all of her, Vance responded, "More than I can count." Again, Vance was "uncomfortable" and either would not respond or had her boyfriend respond.

Vance said, "I told [Peterson] that he needed to respect my boundaries, as I was in a very serious relationship, and that he needed to stop sending me those types of pictures." However, Peterson continued to send the pictures even after Vance told him to stop. When Vance brought up her boyfriend, Peterson told her that her boyfriend "was bad for [her], that [she] needed to leave him, that Peterson could provide for [her] more than he could."

Vance eventually became aware that Peterson was paying attention to who was at her house. She said, "He would send me Snapchats: Oh, I see your boyfriend is not home. Maybe you should come spend the night with me." Vance felt "[u]ncomfortable" knowing that Peterson was driving by her house and watching who was coming and going. When asked if she thought she could call the police if Peterson showed up at her house, Vance responded, "[H]e is a cop, so he would just lie to the cops," "[a]nd they are obviously not going to believe me over a cop." When asked if there was ever a time that Peterson sent her a Snapchat after he passed her driving, she responded, "Yes," "He said: Too good to wave hi."

Vance confirmed that she told Peterson to stop sending her messages and that he was upsetting her. "I told him he wasn't respecting my boundaries and that nothing was going to happen between us and nothing was ever going to happen between us." Peterson had been sending her 20 Snapchats per day, including times when she was at work or after midnight. If she did not respond right away, "[h]e would send me another one until I responded."

According to Vance, a Snapchat message "[s]ometimes . . . erases right away," "[o]therwise, it will stay 24 hours if that's how you have your settings." If there is a message that you want to keep, "[y]ou have to save it in chat or you have to screenshot it"; if you save it, a notification is sent to the other person. She did not use the save function for the pictures or messages Peterson sent "[b]ecause [she] was scared of what he would do if he got a notification that [she] saved it or screenshotted it." When asked if she felt threatened, Vance responded, "Terrified," "I didn't know what he was capable of." Vance felt "[t]errified, unsafe," and "very" intimidated "because even when I told him to stop and respect my boundaries, he continuously messaged me no matter what time of day it was," "[m]y phone was going off, and it was always a notification from him," "[a]nd at that point I just wanted to throw my phone away, but I couldn't because I needed my phone."

Vance "blocked" Peterson "on every social media platform that [she] had" in the middle or end of July 2024, after the Oregon Trail Days "kiddie parade." While Vance was waiting for her sister at the parade, she saw Peterson coming toward her and they "made direct eye contact." Peterson had his daughter and his dog with him. When Peterson approached Vance, they exchanged greetings and then she "just asked if [she] could pet his dog" and "tried to focus on the dog." After Vance finished petting the dog, Peterson "leaned me in for a super-tight hug, and I can't get out," "[a]nd I just froze." The moment felt "[s]cary" "[b]ecause I couldn't move." Even after Vance blocked Peterson on her social media, he still drove by her house; she saw him drive by when she was outside with her dogs. Peterson lived in Scottsbluff and was the chief of police

in Mitchell, Nebraska, neither of which was close to her home in Gering. Vance felt "[n]ot safe" and "uncomfortable."

Vance said she spoke with her uncle (a police officer in Gering) at the end of July 2024, and she then filed a petition for a protection order on August 7. When asked if the "drive-bys" stopped after she filed for the protection order, Vance replied, "Yes." However, she was afraid that if the protection order was not granted, Peterson would "go back to his old ways and start harassing [her] again and start driving by again" and "it's going to get worse."

Peterson testified that he was 44 years old and had been a law enforcement officer since 2002. He had been the chief of police in Mitchell since April 15, 2024, and prior to that he worked for the Scotts Bluff County Sheriff's Office for "[a] couple years."

Peterson had Snapchat contact with Vance "[r]egularly" from April to July 2024. The communications "started very friendly," "I think we . . . talked about her being on the [Gering] fire department," and "she and I would just converse periodically." Peterson knew Vance prior to starting the Snapchat communication; he said he knew her parents and he "poured concrete with her dad and her grandfather." Peterson believed his first in-person conversation with Vance was "the day of the kiddie parade." He was at the parade with his daughter and his dog when they crossed paths with Vance and "conversed shortly."

Peterson agreed that Vance had blocked him on Snapchat. When asked why she had blocked him, Peterson said, "she did not offer me an explanation." When asked if he ever contacted Vance 20 times on any day, Peterson replied, "I don't know," "[t]hat seems -- I -- no[,] I don't know." When asked if he ever made social media contact with women who did not want him contacting them, Peterson replied, "If they tell me that they don't want me contacting them, I won't contact them."

Peterson was also asked numerous questions about his personal and work history. This included questions about his divorces, his conduct towards other women, his conduct towards men who were connected to women he had been in a relationship with, and directives by employers. Peterson's objections based on relevancy, other bad acts, and hearsay were overruled.

In its order entered on April 3, 2025, the district court granted Vance's request for a harassment protection order against Peterson. The court found that Peterson engaged in a knowing and willful course of conduct directed at Vance, which seriously terrified, threatened, or intimidated her and which served no legitimate purpose. Specifically, Peterson "repeatedly sen[t] [Vance] numerous inappropriate Snap Chat messages over several months and [drove] by [her] house, despite numerous advisements to stop by [Vance] and her boyfriend to no avail." The court ordered that Peterson was prohibited from: (1) imposing any restraint upon Vance; (2) harassing, threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of Vance; and (3) telephoning, contacting, or otherwise communicating with Vance.

Peterson appeals.

## ASSIGNMENTS OF ERROR

Peterson assigns, restated, that the district court erred by (1) denying his motion to continue, (2) admitting character evidence over his objections, and (3) finding Vance proved by a preponderance of the evidence that she was a victim of stalking or harassment, and granting her a harassment protection order.

STANDARD OF REVIEW

A motion for continuance is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Estate of Marsh*, 307 Neb. 893, 951 N.W.2d 486 (2020).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Paw K. v. Christian G.*, 315 Neb. 781, 1 N.W.3d 467 (2024).

The grant or denial of a protection order is reviewed de novo on the record. *Dugan v. Sorensen*, 319 Neb. 326, 22 N.W.3d 623 (2025). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

MOTION TO CONTINUE

Peterson claims that the district court abused its discretion by overruling his motion to continue, and that deprived him of a fair trial. He noted that Vance had been granted her motion to continue on August 12, 2024, and she had from that date until February 20, 2025, to prepare her case. He, however, "lost his attorney on January 3, 2025[,] and was only able to secure substitute counsel the day before trial," and his motion to continue "was denied despite the fact that the matter had already been rescheduled and delayed for almost six months at [Vance's] request." Brief for appellant at 7.

When the show cause hearing began on February 20, 2025, Peterson's motion to continue was argued to the district court. Vance's counsel opposed the motion, noting that Peterson discharged his first attorney on January 2, the court approved the discharge on January 3, "[w]e set this hearing on January 14th" and "[o]n January 16th the City of Mitchell signed the certified mail return receipt for the notice of the trial setting." Counsel stated, "we got notice at 11:00 today . . . about five weeks later" that Peterson hired new counsel; "[t]his is hard for Ms. Vance," "she's shaken being here, and having to continue this because of a last-minute action on the part of Mr. Peterson would be very frustrating."

Peterson's counsel stated that he "was hired this morning," and while "this case has been lingering for a while," Vance asked for a continuance on a previous occasion and there had been delay caused by discovery issues; "Peterson has not been deliberately delaying things." Counsel "would remind the court that Mr. Peterson is the person who will wind up branded for life if this protection order is granted, and it will impact his professional life" as "[h]e's the Chief of Police in Mitchell." Peterson was "not asking for a lengthy continuance," "but a week or two" so that counsel could "review the entire record, which is very, very thick."

In response, Vance's counsel stated, "[W]e haven't heard an explanation yet of why Mr. Peterson waited from January 16th until February 20th to hire counsel again," "[a]ctually, from January 2nd." The district court stated that it "would also note that at our last hearing Mr. Peterson did not even show, and that's when we set the trial date." "I instructed [Vance's counsel] to send

out notice by certified mail"; "[c]ertainly that has been received, and [Peterson] waits till the day of trial." The court denied Peterson's request to continue.

Despite having had several weeks to obtain new counsel after his first attorney was discharged, Peterson did not retain new counsel until just prior to the show cause hearing on February 20, 2025, nor did he file a motion to continue prior to that date. See, Neb. Rev. Stat. § 25-1148 (Reissue 2016) (application for continuance shall be by written motion and supported by affidavit); *State on behalf of Keegan M. v. Joshua M.*, 20 Neb. App. 411, 824 N.W.2d 383 (2012) (although not determinative, appellate court considers whether moving party complied with § 25-1148 in determining whether trial court abused its discretion in granting or denying motion to continue trial). Given the timeline of events noted above, we find that the district court did not abuse its discretion in denying Peterson's request for a continuance.

### CHARACTER EVIDENCE

Peterson argues that the district court abused its discretion by admitting character evidence over his objections. See Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) (evidence of other crimes, wrongs, or acts is not admissible to prove character of person in order to show that he or she acted in conformity therewith; it may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.)

Even if the district court erred in receiving character evidence, any such error was harmless. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *In re Hessler Living Trust*, 316 Neb. 600, 5 N.W.3d 723 (2024). See, also, *Tapia-Reyes v. Excel Corp.*, 281 Neb. 15, 793 N.W.2d 319 (2011) (it is presumed that judges disregard evidence which should not have been admitted).

In its order, the district court found that Vance, "without the analysis of any evidence offered by [her] pursuant to [§] 27-404(2)," met her burden of proof for a harassment protection order. Therefore, "there is no need for this court to do any analysis of the evidence offered pursuant to [§] 27-404(2)." Because the district court did not rely on any character evidence when it decided to grant Vance a protection order against Peterson, any alleged error in the admission of character evidence at the show cause hearing was harmless.

Likewise, this court will not consider any character evidence when reviewing the sufficiency of the evidence for the protection order.

### SUFFICIENCY OF EVIDENCE

Peterson claims that the district court erred by finding that Vance proved by a preponderance of the evidence that she was a victim of stalking or harassment and granting her a harassment protection order.

A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Dugan v. Sorensen, supra*. A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief. *Id.*

Although Vance filed a form petition and affidavit for a sexual assault protection order, at the show cause hearing she testified that she was requesting a harassment protection order and not a sexual assault protection order. See § 28-311.11(8) (court may treat petition for sexual assault protection order as petition for harassment protection order if it appears from facts in petition, affidavit, and evidence presented at show cause hearing that such other protection order is more appropriate and if court makes specific findings that such order is more appropriate or petitioner has requested court to so treat the petition). In its order, the district court stated that its examination would be on whether a harassment protection order should be granted.

The harassment protection order statute in effect at the time of the order entered in this case was Neb. Rev. Stat. § 28-311.09 (Cum. Supp. 2024). We note that § 28-311.09 has since been repealed by 2025 Neb. Laws, L.B. 80, § 52. As noted previously, there is now a Protection Orders Act, § 26-101 et seq., which became effective on September 3, 2025. Since the Protection Orders Act was not yet in effect when the protection order was entered in this case, we will rely upon the statutory scheme in effect at the time.

Pursuant to § 28-311.09(1), any victim who has been harassed as defined by Neb. Rev. Stat. § 28-311.02 (Reissue 2016) may file a petition and affidavit for a harassment protection order. According to § 28-311.02(2),

> (a) Harass means to engage in a knowing and willful course of conduct directed at a specific person which seriously terrifies, threatens, or intimidates the person and which serves no legitimate purpose;
>
> (b) Course of conduct means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including a series of acts of following, detaining, restraining the personal liberty of, or stalking the person or telephoning, contacting, or otherwise communicating with the person[.]

Nebraska applies an objective construction to the harassment protection order statutes. See *Dugan v. Sorensen*, 319 Neb. 326, 22 N.W.3d 623 (2025). When assessing whether the evidence establishes a course of conduct that seriously terrifies, threatens, or intimidates a specific person, the evidence should "'"be assessed on the basis of what a reasonable person under the circumstances would experience."'" *Id.* at 337, 22 N.W.3d at 633 (quoting *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023)). Thus, the inquiry is "'whether a reasonable person would be seriously terrified, threatened, or intimidated by the conduct at issue.'" *Id.*

Given the statutory text governing harassment protection orders and our cases construing it, the petitioner at a show cause hearing must prove the following material elements by a preponderance of the evidence: (1) the respondent knowingly and willfully engaged in a course of conduct directed at the petitioner that seriously terrified, threatened, or intimidated the petitioner; (2) a reasonable person under the circumstances would have been seriously terrified, threatened, or intimidated by the respondent's conduct; and (3) the respondent's conduct served no legitimate purpose. *Dugan v. Sorensen, supra*.

Vance did not specifically offer her petition and affidavit into evidence at the show cause hearing. However, "the petition and affidavit shall be deemed to have been offered into evidence at any show cause hearing." § 28-311.09(7). And "[t]he petition and affidavit shall be admitted

into evidence unless specifically excluded by the court." *Id.* Here, Vance's petition and affidavit were not specifically excluded.

Vance testified that beginning in April 2024, Peterson began communicating with her via Snapchat. At first the Snapchats Peterson sent were friendly, and he sent "[v]ideos and pictures of his dogs." But then he "started sending shirtless pictures" of himself, "[s]hower pictures," and "crotch pictures." He also sent numerous messages to Vance stating, "'I want to see you,'" "'I want to see all of you'"; Vance took these messages to mean that Peterson wanted to see her naked or wanted nude pictures of her. The Snapchats made Vance "uncomfortable." Despite Vance's directives to Peterson that he needed to respect her boundaries and stop sending those types of pictures, Peterson continued to send her pictures. Vance eventually became aware that Peterson, who did not live nor work near her home, had been driving by her house. He sent Vance Snapchats noting that he could see that her boyfriend was not home, and Peterson asked her to spend the night with him. Vance felt "[u]ncomfortable" knowing that Peterson was driving by her house and watching who was coming and going. Vance did not think she could call law enforcement because Peterson "is a cop" and "they are obviously not going to believe [her] over a cop." Vance stated that Peterson had been sending her 20 Snapchats per day, including times when she was at work or after midnight. If she did not respond right away, "[h]e would send me another one until I responded." Vance felt "[t]errified, unsafe," and "very" intimidated "because even when I told him to stop and respect my boundaries, he continuously messaged me no matter what time of day it was." Even after Vance "blocked" Peterson from her social media in July after their encounter at the parade (where he hugged her "super-tight"), she still saw him drive by her house. Peterson's drive-bys stopped after she filed for the protection order.

As noted by the district court, "[Peterson] never contested [Vance's] testimony regarding the inappropriate nature and number of Snap Chat messages [she] received from [him]," "[n]or did he contest [Vance] and her boyfriend repeatedly telling [him] to stop and respect [her] boundaries to no avail." Additionally, in its order, the district court made the following observation: "As soon as this court [sic] entered the courtroom for the hearing in this matter on February 20, 2025, this court observed [Vance] seated at counsel table with her attorney. [Vance] was cowering and shaking with tears in her eyes from having to be in the same room with [Peterson]."

In his brief, Peterson argues that "[t]his was a comparatively short time of little more than three months," and this court "should include consideration of the length of time in determining the reasonableness of [Vance's] claim of being terrified, etc." Brief for appellant at 11. He also "suggest[s] that the Court look at the nature of the actual conduct alleged," that "it was primarily electronic messaging," some of which "indicated that [he] was trying to establish[] a romantic relationship with Ms. Vance but it was not explicitly threatening or intimidating." *Id.* at 11-12. Additionally, "there has been no protection order in place for the pendency of this case," and "[w]hatever the issue was, it seems to have resolved with the filing of the request for the protection order." *Id.* at 12. We are not persuaded by Peterson's arguments. Neither the 3-month timeframe, nor the fact that it was "primarily electronic messaging," prevents Peterson's actions from being a "course of conduct" under § 28-311.02(2)(b). Furthermore, even if Peterson's actions towards Vance stopped after she filed her petition and affidavit for a protection order, that does not mean the issue had resolved; Peterson could have just been on his best behavior during the pendency of this case, knowing his actions would be scrutinized.

Based on the evidence presented at the show cause hearing, we find by a preponderance of the evidence that Peterson knowingly and willfully engaged in a course of conduct directed at Vance that seriously terrified, threatened, or intimidated her. We further find that a reasonable person under the circumstances would have been seriously terrified, threatened, or intimidated by Peterson's conduct. Peterson was a law enforcement officer who ignored directives to stop his unwanted and repeated communications, and he then escalated his behaviors. Finally, we find that Peterson's conduct served no legitimate purpose.

Because Vance proved by a preponderance of the evidence that she was a victim of harassment, the harassment protection order against Peterson was properly granted. We note that although the district court's April 3, 2025, order did not state the effective period of the harassment protection order, it is effective for a period of 1 year from the date of the order. See § 28-311.09(4) (harassment protection order effective for period of 1 year unless otherwise dismissed or modified by the court).

CONCLUSION

For the foregoing reasons, we affirm the district court's April 3, 2025, order granting Vance a harassment protection order against Peterson.

AFFIRMED.